# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **MEDHAT S. BOLES, SR.,** | ) | **NO. EDCV 15-1643-KS** |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## INTRODUCTION

Plaintiff filed a Complaint on August 14, 2015, seeking review of the denial of his application for disability insurance benefits ("DIB"). On December 18, 2015, the parties filed a Joint Stipulation ("Joint Stip.") in which plaintiff seeks an order reversing the Commissioner's decision and remanding the matter for further administrative proceedings. (Joint Stip. at 24.) The Commissioner requests that the ALJ's decision be affirmed. (*Id.* at 25.) On September 10 and 11, 2015, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 10-11.) The Court has taken the matter under submission without oral argument.

1

1

2

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

3

On June 6, 2011, plaintiff, who was born on March 10, 1963,[1] applied for a period of disability and DIB.  (Administrative Record ("A.R.") 235-236.)  Plaintiff alleged disability commencing February 19, 2009, due to heart problems, back problems, kidney problems, and chronic neck pain.  (*Id.* 287, 319.)  Plaintiff's prior relevant work experience included employment as an estimator; a supervisor, painting; and a painter.  (*Id.* 62, 288.)   The Commissioner denied plaintiff's application initially (*id.* 82-92) and on reconsideration (*id.* 96-106).  On April 19, 2012, plaintiff requested a hearing.  (*Id.* 118-119.)  On November 7, 2013, plaintiff, who was represented by counsel, testified before Administrative Law Judge Christine Long ("ALJ").[2]  (*Id.* 34-36, 43-60.)  An Arabic interpreter was present "in case [plaintiff] d[id not] understand something."  (*Id.* 31.)  Dr. Ronald Kendrick, a medical expert (*id.* 36-42), and Alan Ey, a vocational expert ("VE") (*id.* 60-70), also testified.   On December 5, 2011, the ALJ issued an unfavorable decision, denying plaintiff's claims for DIB.  (*Id.* 13-21.)  On June 18, 2015, the Appeals Council denied plaintiff's request for review.  (*Id.* 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2014 and had not engaged in substantial gainful activity from the alleged onset date of February 19, 2009.  (A.R. 15.)  The ALJ further found that plaintiff had the following severe impairments:   "lumbar spine spondylosis with disk herniation and stenosis but no nerve root impingement; coronary artery disease – status post stent placement

---

[1]     On the alleged onset date, plaintiff was 45 and thus a "younger person" under agency regulations.  *See* 20 C.F.R. § 404.1563.  On March 10, 2013, plaintiff turned 50 and, as a result, became a person closely approaching advanced age under agency regulations.  *Id.* § 404.1563(d).

[2]     A hearing on January 24, 2013 was continued to allow plaintiff to retain an attorney.  (A.R. 76-81.)

in 2006; hypertension; and nephrolithiasis – status post lithotripsy procedures." (*Id.*) The ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (*Id.* 16.) The ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform "light work" except as follows:  he is limited to "lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours out of an 8 hour workday; standing and/or walking six hours out of an eight hour workday; alternating sitting and standing briefly every two hours; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; and no working at unprotected heights or around dangerous moving machinery." (*Id.*) The ALJ found that plaintiff was able to perform his past relevant work as an estimator (DOT 169.267-038) as generally performed. (*Id.* 20-21.) Accordingly, the ALJ found that plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* 21.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

Plaintiff alleges the following three errors: (1) the Commissioner did not properly consider the testimony of the medical expert, Dr. Ronald Kendrick (*see* Joint Stip. at 5-9); (2) the ALJ improperly evaluated plaintiff's subjective symptom testimony (*id.* 11-16); and (3) the ALJ improperly evaluated the relevant vocational issues at step four of the sequential evaluation process (*id.* 20-22).

\\
\\
\\

4

## I.     The ALJ Properly Considered The Testimony Of Dr. Kendrick.

At the hearing on November 7, 2013, Dr. Kendrick, an orthopedic specialist, testified as a medical expert.  (A.R. 37-42.)  Based on Dr. Kendrick's background and review of the record, Dr. Kendrick determined that plaintiff has primarily lumbar spondylosis with a disc protrusion at L5-S1.  (*Id.* 39.)  The ALJ asked Dr. Kendrick to explain the implications of plaintiff's "fairly large" disc protrusions.  (*Id.* 38.)  Dr. Kendrick testified as follows:

> Well, he has what's called moderate stenosis in the lateral recessor neuroforamina . . . , and in the central canal, it also indicates severe to moderate central canal stenosis.

> But usually, in the lumbar region, central canal stenosis is not an issue like it would be in the cervical spine.  There's usually adequate room for the nerves to go through even though the available space is reduced.

> And the moderate degree of foraminal stenosis is kind of par for the course.  You see that on many MRIs.  And unless the nerve impingement, which is present, you know, causes evidence of neurological deficit with motor and sensory loss, and the neuro anatomic distribution of the involved nerve, then it doesn't meet or equal any of the listings.

(*Id.* 39.)  Dr. Kendrick opined that plaintiff's impairments did not meet or equal a listing, and that plaintiff would be capable of light work, with lifting 20 pounds occasionally, 10 pounds frequently; standing or walking for six out of eight hours; sitting for at least six out of eight hours; and bending, stooping, kneeling, and crawling occasionally.  (*Id.*).

5

Plaintiff's counsel had the opportunity to ask questions of Dr. Kendrick. (A.R. 39-42.)   First, plaintiff's counsel asked Dr. Kendrick about references in the record to radiculopathy in the lower extremities. (*Id.* 39.)  Dr. Kendrick responded that plaintiff could have occasional radiculopathy, but there was no indication that plaintiff was a surgical candidate because of the radiculopathy. (*Id.* 39-40.)  Second, plaintiff's counsel asked Dr. Kendrick if there would be some variability in plaintiff's limitations. (*Id.* 40.)  Dr. Kendrick responded that there would be variability, meaning that some days plaintiff might be in more pain, and some days plaintiff might be in less pain. (*Id.*)  Third, plaintiff's counsel asked Dr. Kendrick if plaintiff could climb stairs, and whether Dr. Kendrick anticipated that there would be days where plaintiff would not be able to climb stairs at all. (*Id.*)  Dr. Kendrick responded that plaintiff could climb stairs occasionally, and there would be days where plaintiff would not be able to climb stairs at all. (*Id.*)  Dr. Kendrick could not predict how frequently plaintiff would be unable to climb stairs. (*Id.* 40-41.)  Fourth, plaintiff's counsel asked Dr. Kendrick whether plaintiff's pain medication would have side effects or further limit plaintiff's functioning. (*Id.* 41.)  Dr. Kendrick responded that he did not see evidence in the record showing that the pain medication caused side effects that limited plaintiff's functioning, and that a treatment note from May 2013 indicated that plaintiff had no distress or musculoskeletal abnormality and that nonsteroidal anti-inflammatory drugs and occasional Norco were managing plaintiff's pain. (*Id.*)  Fifth, plaintiff's counsel asked Dr. Kendrick if plaintiff was limited around unprotected heights or moving machinery. (*Id.* 42.)  Dr. Kendrick responded that plaintiff should be precluded from working around heights or moving machinery. (*Id.*)

The ALJ considered and gave "great weight" to Dr. Kendrick's opinion. (A.R. 19.)  The ALJ summarized Dr. Kendrick's opinion and found that it was "highly credible" because it was supported by the objective medical evidence. (*Id.*)  The ALJ also noted that Dr. Kendrick "is a medical specialist, has an awareness of all the medical evidence in the record, and has an understanding of social security disability programs and evidentiary

requirements." (*Id.*)  The ALJ also gave "significant weight" to the State agency medical consultant on reconsideration, who found that plaintiff could perform a range of light work. (*Id.* 20, 103-104.)  The ALJ gave "little weight" to the opinions of the internal medicine consultative examiner and the State agency medical consultant on initial review, who both assessed that plaintiff could perform a range of medium work. (*Id.* 20, 88-90, 750-55.)  As the ALJ noted, the record contains no functional limitations from any treating source. (*Id.* 20.)

Plaintiff argues that the ALJ "clearly misstated the facts in this case and misrepresented the bases for supporting the testimony of . . . Dr. Kendrick." (Joint Stip. at 7.)  Plaintiff first takes issue with the ALJ's statement that Dr. Kendrick "was present at the hearing by telephone, had the opportunity to question [him], and reviewed all the medical exhibits of record prior to testifying." (*Id.*; *see* A.R. 19.)  Plaintiff contends that Dr. Kendrick was not given the opportunity to question plaintiff, and that Dr. Kendrick was not present during plaintiff's testimony. (Joint Stip. at 7.)  However, as the Commissioner argues, Dr. Kendrick indeed had the opportunity to question plaintiff – plaintiff was present at the time of Dr. Kendrick's testimony – but Dr. Kendrick did not question him. (*Id.* at 10.)  Thus, the ALJ's statement that Dr. Kendrick had the opportunity to question plaintiff was not a misstatement.  Regarding plaintiff's argument that Dr. Kendrick was not present during plaintiff's testimony, plaintiff fails to show that he was harmed by the fact that Dr. Kendrick did not hear his testimony. *See Molina*, 674 F.3d at 1111 ("we may not reverse an ALJ's decision on account of an error that is harmless") (citation omitted).

Plaintiff next contends that the ALJ took "only . . . portions of [Dr. Kendrick]'s testimony" to support the RFC assessment. (Joint Stip. at 7.)  Specifically, plaintiff argues that his inability to climb stairs on an unpredictable basis, as testified by Dr. Kendrick, "would have a detrimental effect" on his ability to perform his past work as an estimator,

7

which required him to frequently go to job sites where he would need to climb stairs, among other tasks.[3] (*Id.* at 8; *see* A.R. 52.) Plaintiff misconstrues Dr. Kendrick's testimony.

Dr. Kendrick testified that plaintiff could climb stairs occasionally. (A.R. 40.) In response to questioning from plaintiff's counsel, Dr. Kendrick testified that he could not predict how frequently plaintiff would not be able to climb stairs, and stated only that "it c[ould] happen." (A.R. 40-41.) Contrary to plaintiff's contention, Dr. Kendrick did not qualify his testimony that plaintiff could climb stairs occasionally with a limitation that plaintiff's ability to climb stairs would vary from day to day. (*Id.* 40-41.) Accordingly, the ALJ neither cherry picked portions of Dr. Kendrick's testimony to support the RFC, nor failed to explain why she rejected any portion of the testimony. The ALJ did not err in considering the testimony of Dr. Kendrick, and properly relied on his testimony. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinions of a testifying medical expert serves "as substantial evidence supporting the ALJ's findings with respect to [the claimant's] physical impairment and her exertional limitations").

## II.     The ALJ Did Not Err In Assessing Plaintiff's Credibility.

Plaintiff's second contention is that the ALJ improperly discounted his subjective symptom testimony. (Joint Stip. at 12-16.) An ALJ must make two findings before determining that a claimant's pain or symptom testimony is not credible. *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). "Second, if the claimant has produced that

---

[3]     Plaintiff's argument that an inability to climb stairs would have a detrimental effect on his ability to perform his past work as an estimator as he performed it lacks merit. Here, the ALJ found that plaintiff could perform his past relevant work as an estimator as generally performed, but not as actually performed. (*Id.* 21.) According to the DOT, an estimator job is sedentary work where climbing is "not present." DOT 169.267-038.

evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms." *Id.* "General findings are insufficient." *Brown-Hunter*, 798 F.3d at 755 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). Further, "subjective pain testimony cannot be rejected on the *sole* ground that it is not fully corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (emphasis added) (citation omitted).

Here, the ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely credible." (A.R. 18.) The ALJ cited the following reasons for discounting plaintiff's excess pain testimony: (1) plaintiff's ability to engage in "a somewhat normal level of daily activity and social interaction" undermined the credibility of plaintiff's allegations of disabling functional limitations; (2) the objective medical evidence did not support the severity of plaintiff's allegations; and (3) plaintiff's treatment was routine and conservative. (*Id.* 17-19.)

The ALJ's reasons for discounting plaintiff's subjective symptom testimony are legally sufficient and supported by substantial evidence in the record. The ALJ properly relied on inconsistencies between plaintiff's claims and his demonstrated activities. (A.R. 17); *see Reddick*, 157 F.3d at 722 ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility."). Here, the ALJ specifically noted that, despite plaintiff's allegations that he had difficulty finishing housework and other chores, wore a back brace, required a one-hour nap during the day, had to lay down every day for the last two weeks because he felt dizzy, and could not stand up due to back pain and numbness in his legs, plaintiff was capable of: taking his kids to school; preparing simple meals; doing the laundry; walking one mile in one hour; climbing 15 flights of stairs; carrying shopping bags from the car to the house twice a day; going shopping three to four times a week; driving a car between five and 15

9

miles; and changing the car's oil.  (A.R. 17, 27, 48, 313-314, 316.)   The ALJ could reasonably find that plaintiff's level of activity undermined his claims of greater incapacity.  *See Molina*, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").

Plaintiff argues that the ALJ should have confirmed that he was capable of walking one mile in one hour and was capable of climbing 15 flights of stairs, and that the ALJ took plaintiff's statements out of context because the ALJ did not mention that plaintiff indicated that he would have to lay down on the floor after walking one mile.  (Joint Stip. at 12-13.)  Plaintiff also argues that "[t]he ALJ has not cited any activities of daily living which a reasonable person could conclude would be inconsistent with [his] other claims of disability including his need to lay down on a daily basis."  (*Id.* at 15-16.)  Even assuming the ALJ erred in discounting plaintiff's subjective symptom testimony based on plaintiff's daily activities, any error is harmless because the ALJ's remaining reasons for discounting plaintiff's subjective symptom testimony are clear and convincing and supported by substantial evidence.  *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (finding that the ALJ's error in giving two invalid reasons for partially discrediting Plaintiff's testimony was harmless where the ALJ gave valid reasons for partially discrediting Plaintiff's testimony); *see also Brown-Hunter*, 806 F.3d at 492 (ALJ's error is harmless if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned'")

The ALJ properly discounted plaintiff's subjective symptom testimony based on inconsistency with the objective medical evidence.  The ALJ noted that diagnostic testing indicated lumbar spine spondylosis with disk herniation and stenosis, but no nerve root impingement.  (A.R. 18, 38-39, 757-758.)  Plaintiff underwent surgery for kidney stones in June and July 2010, but there was little evidence of subsequent problems.  (*Id.* 362-363, 366,

369, 371-683, 903, 905-906, 972-983, 1009-1010.)  In April 2012, a CT of plaintiff's kidney showed no evidence of obstructive uropathy, and no ureteral calculi.  (*Id.* 18, 906.)  A single small nonobstructing calculus was seen within each kidney, postsurgical changes were noted in the right lower quadrant, and no other abnormality was seen.  (*Id.*)  In March 2013, a CT of plaintiff's kidney showed multiple nonobstructing stones within the kidneys bilaterally measuring 3-4 mm.  (*Id.* 18-19, 979.)  A May 2013 treatment note indicated that plaintiff reported occasional right flank pain that was not bothersome, and no dysuria or hernaturia.  (*Id.* 19, 1009.)  His physical examination was generally unremarkable.  (*Id.*)

Plaintiff's hypertension was described as stable on medication in November 2010.  (A.R. 18, 606.)  A December 22, 2009 echocardiogram indicated good LV systolic with abnormal diastolic function grade 1, and mild regurgitation across the tricuspid valve.  (*Id.* 349.)  On December 28, 2009, plaintiff reported no complaints and told his doctor that he was going to Egypt.  (*Id.* 348.)  On November 3, 2010, plaintiff complained of a "poking" sensation over his left chest, but his cardiovascular and pulmonary/chest examinations were normal.  (*Id.* 597.)  Plaintiff reported that he did not exercise regularly, but he was able to walk and climb stairs without limitation.  (*Id.* 595.)

A follow-up exercise myocardial perfusion study on November 17, 2010 indicated no evidence of significant stress-induced ischemia at the level of stress achieved.  (*Id.* 18, 608.)  A May 2011 chest x-ray showed no acute cardiopulmonary disease and no interval change.  (*Id.* 18, 663.)  Plaintiff was hospitalized for four days in May 2011 with diagnoses of chest pain, noncardiac in etiology; normal coronary angiogram with only finding of right coronary artery 50% stenotic; hyperlipidemia; labile hypertension; history of atherosclerotic heart disease, status post stent; and chronic smoker.  (*Id.* 18, 694-695.)  On December 22, 2012, plaintiff went to the emergency department complaining of intermittent left chest pain and weakness.  (*Id.* 927.)  His physical examination was normal; his EKG showed sinus bradycardia, rate 59, no ST/T wave changes, and no acute ischemic change; and his CXR

was normal without acute changes, no infiltrate or ptx, and mediastinum within normal limits.  (*Id.* 931.)

An October 2011 MRI of the lumbar spine showed a L5-S1 large one centimeter by one centimeter disc herniation extrusion type, extensive bilateral facet arthropathy, moderate-to-severe spinal canal stenosis, bilateral facet arthropathy and moderate bilateral neural foraminal narrowing, and a slight progression of the disc disease compared to the prior examination in March 2003.  (A.R. 18, 757-758.)  At the hearing, the ALJ specifically asked the medical expert, Dr. Kendrick, about the implications of the disc protrusion.  (*Id.* 38.)  Dr. Kendrick indicated that central canal stenosis in the lumbar spine region was not as concerning as in the cervical region because there is usually adequate room for the nerves to go through even though the available space is reduced, there was no evidence of nerve root impingement with neuro-deficits, and plaintiff's radiculopathy was not associated with a deficit in the record.  (*Id.* 19, 38-39.)  A January 25, 2012 physical therapy lumbar spine evaluation assessed increased pain, and decreased range of motion, strength, and functional activity tolerance.  (*Id.* 841.)  The physical therapist indicated that plaintiff's treatment plan was for eight weeks and his rehabilitation potential was "good."  (*Id.* 842.)  A December 12, 2103 MRI of the lumbar spine indicated that alignment was normal, vertebral body heights were normal, bone marrow was normal in signal without evidence of fracture or marrow replacing lesion, and the spinal cord demonstrated normal course, caliber and signal.  (*Id.* 1019.)

Imaging of the cervical spine on November 21, 2011 indicated moderate DJD of the cervical spine evidenced by degenerative spurrings of C5 and C6, associated with narrowing of the C5-C6 disk space; and straightening of lordotic curve of cervical spine secondary to arthritis and paravertebral muscular spasm probably.  (A.R. 827.)  A November 30, 2011 physical therapy cervical spine evaluation indicated that plaintiff complained of having chronic neck spasm and intermittent pain for years without weakness or numbness.  (*Id.* 18,

812.)  On examination, plaintiff had tenderness over trapezius and cervical muscles with spasm, good range of motion, and no neurovascular deficit distally.  (*Id.*)  On February 13, 2013, plaintiff exhibited tenderness and spasm over the cervical back, but normal range of motion, no swelling, no edema, no deformity, no laceration and normal pulse.  (*Id.* 954.)  A December 12, 2013 MRI of the cervical spine indicated a large posterior disk osteophyte complex that causes moderate to severe central spinal canal narrowing, likely myelomalacia at the area of narrowing, and uncovertebral osteophytosis causes severe right and moderate left neural foraminal narrowing at C5-6; small to moderate posterior disk osteophyte complex, right uncovertebral osteophytosis causes moderate right neural foraminal narrowing, and mild central spinal canal narrowing at C3-4; right uncovertebral osteophytosis and facet degeneration cause of mild to moderate right neural foraminal narrowing at C4-5; and left posterior disk extrusion that extends 9 mm anteroposteriorly compressing the traversing left S1 root in the lateral recess, right lateral recess was also narrowed, and disk space narrowing and disk bulge caused mild bilateral neural foraminal narrowing at L5-S1.[4]  (*Id.* 1019-1020.)

Regarding the ALJ's reliance on the lack of supporting objective medical evidence to discount plaintiff's subjective symptom testimony, plaintiff argues only that the ALJ was not permitted to rely on this reason alone.  (Joint Stip. at 14.)  The Court agrees.  However, although the conflict between plaintiff's testimony and the objective medical evidence cannot form the sole basis for the ALJ's adverse credibility determination, the Court finds that the ALJ did not err by finding that the conflict is one reason, among several, for discounting plaintiff's subjective symptom testimony.  *See Burch*, 400 F.3d at 681.

---

[4]     The December 12, 2013 MRI of the cervical and lumbar spine was submitted to the Appeals Council on January 17, 2014.  (A.R. 1018-1020.)  The Appeals Council received the additional evidence and made it a part of the record, and therefore, the Court must consider such evidence.  (*Id.* 5.)  *See Brewes v. Commissioner of Social Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012) ("When the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence.").

1    The ALJ also did not err in citing plaintiff's conservative treatment as a third reason
2    for discounting plaintiff's subjective symptom testimony.  *See Parra v. Astrue*, 481 F.3d
3    742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a
4    claimant's testimony regarding severity of an impairment."); *see also Tommasetti v. Astrue*,
5    533 F.3d 1035, 1049 (9th Cir. 2008) (claimant's favorable response to conservative
6    treatment – namely physical therapy, anti-inflammatory medication, TENS unit, and
7    lumbosacral corset – undermined claimant's reports regarding the disabling nature of his
8    pain).

9

10   Here, the ALJ noted that plaintiff received routine and conservative treatment.  (A.R.
11   18, 38, 694-695, 762.)  Plaintiff's treatment generally included medication management, a
12   TENS unit, physical therapy, hot/cold therapy, and home exercise.  (*Id.* 18-19, 762, 813-817,
13   825-828, 836-839, 842.)  After plaintiff's surgeries to remove kidney stones, he received
14   conservative management for small renal stones.  (*Id.* 18, 362-363, 366, 369, 1010.)
15   Plaintiff was advised to drink plenty of water, limit salt and meat intake, and limit diets high
16   in oxalate.  (*Id.* 1010.)  In May 2013, plaintiff indicated that his pain was managed with
17   nonsteroidal anti-inflammatory drugs and occasional Norco.  (*Id.* 19, 1009.)  In the records
18   submitted to the Appeals Council, there is a note on January 13, 2014 indicating "[r]eferral
19   to neurosurgery in Fontana," but there is no indication in the record of the results of the
20   referral.  (*Id.* 1020.)  Furthermore, the Court notes that plaintiff does not challenge the ALJ's
21   reliance on routine and conservative treatment to discount his credibility.  (Joint Stip. at 12-
22   16.)  The record as a whole supports the ALJ's finding that plaintiff's credibility was
23   undermined by his routine and conservative treatment and favorable response to that
24   treatment.

25

26   On this record, the Court finds that the ALJ's detailed analysis, closely tied to the
27   objective medical evidence and conservative treatment, provides clear and convincing

28

14

reasons for discounting plaintiff's credibility.  Accordingly, the ALJ did not err in finding plaintiff not entirely credible.

## III.    The ALJ Did Not Err At Step Four.

Plaintiff's final contention is that the ALJ erred at step four of her analysis.  (Joint Stip. at 20-22.)

At step four of the five-step sequential evaluation, the ALJ determines whether a claimant has the RFC to perform her past relevant work. *See* 20 C.F.R. § 404.1520(f).  The term "past relevant work" means either (1) a specific past job as the claimant "actually performed" it, or (2) a past relevant job as it is "generally performed" or "usually performed" in the national economy. *See e.g., Pinto v. Massanari*, 249 F.3d 840, 844-45 (9th Cir. 2001) (citing Social Security Ruling ("SSR") 82-62 and 20 C.F.R. §§ 404.1571, 404.1574, 404.1565, 416.971, and 416.974).  The ALJ is not required to make explicit findings at step four on both prongs – that is, an ALJ may deny a claimant at step four based on a determination that he can do his past relevant work as he "actually performed" it or as that job is "generally performed." *See Pinto,* 249 F.3d at 844-45.  However, a vocational expert's finding that a claimant can do his past relevant work must comply with the regulations and rulings cited above. *Id.* (citing *Villa v. Heckler*, 797 F.2d 794, 798 (1986)).

Where a claimant cannot perform his past relevant work as he "actually performed" it, "but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found 'not disabled.'"  SSR 82-61.  A plaintiff has the burden at step four to show that he cannot perform past relevant work, either as he actually performed it, or as that particular work is generally performed in the national economy. *Id.*  However, an ALJ always has a duty to make the requisite

sufficient factual findings to support her conclusion when denying a claimant at step four.  *Carmickle*, 533 F.3d at 1167 (citing *Pinto*, 249 F.3d at 847).

The DOT is the Commissioner's primary source of reliable vocational information, and is usually the best source for how a job is "generally performed" in the national economy.  *Pinto,* 249 F.3d at 845-46; *Johnson v. Shalala*, 60 F.3d 1428, 1434-35 and n.6 (9th Cir. 1995).  "The DOT creates a rebuttable presumption as to the job classification.  To deviate from the DOT classification, an ALJ 'may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.'"  *Tommasetti*, 533 F.3d at 1042 (quoting *Johnson v. Shalala*, 60 F.3d at 1435).  The Social Security Rulings caution, however, that "[f]inding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable."  SSR 82-61.

The DOT describes job number 169.267-038 as "estimator."  DOT 169.267-038.  According to the DOT, an estimator does the following:

> Analyzes blueprints, specifications, proposals, and other documentation to prepare time, cost, and labor estimates for products, projects, or services, applying knowledge of specialized methodologies, techniques, principles, or processes:  Reviews data to determine material and labor requirements and prepares itemized lists.  Computes cost factors and prepares estimates used for management purposes, such as planning, organizing, and scheduling work, preparing bids, selecting vendors or subcontractors, and determining cost effectiveness.  Conducts special studies to develop and establish standard hour and related cost data or effect cost reductions.  Consults with clients, vendors, or other individuals to discuss and formulate estimates and resolve issues.  May specialize according to particular service performed,

16

1        type of product manufactured, or phase of work involved, such as tool and

2        fixture costs, production costs, construction costs, or material costs.

3

4  *Id.*  The DOT describes the estimator job as "sedentary," meaning the work involves sitting

5  most of the time, but may involve walking or standing for brief periods of time.  *Id.*  The

6  DOT further indicates that climbing is not present in the estimator job.  *Id.*

7

8       Plaintiff argues that "[i]t is hard to imagine that [the estimator job] can be performed

9  in complete isolation in an office as described in the DOT."  (Joint Stip. at 22.)  As stated

10  above, the ALJ is entitled to rely on the DOT's description of the requirements for each

11  listed occupation and on VE testimony about the specific occupations that the plaintiff can

12  perform.  *Zavalin v. Colvin*, 778 F.3d 842, 845-46 (9th Cir. 2015); *see also Osenbrock v.*

13  *Apfel*, 240 F.3d 1157, 1163 (9th Cir. 2001) (testimony of a VE constitutes substantial

14  evidence).  These are designated sources of "reliable job information."  *See* 20 C.F.R.

15  §404.1566(d)-(e); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (ALJ may rely

16  on "any reliable job information," including the testimony of a VE); *Johnson*, 60 F.3d at

17  1435.  Plaintiff cites no legal authority for his argument that the ALJ should not have relied

18  on the DOT and the VE testimony where it is "hard to imagine" that a job can be performed

19  as described in the DOT, and the Court is aware of none.

20

21      Furthermore, plaintiff's counsel specifically asked the VE whether the estimator job

22  was really sedentary, as classified by the DOT.  (A.R. 63.)  The VE responded that he had

23  "seen it both ways," and he had "seen estimators go out and collect the data themselves,"

24  which would be "more likely light than it is sedentary," and estimators "sitting in the office

25  working off the blueprints, putting together bids, doing that sort of thing."  (*Id.* 63, 65.)  The

26  VE testified that a person of plaintiff's age, education, work experience, and RFC could

27  perform the estimator job as per the DOT, not as actually performed, due to the climbing

28  plaintiff performed as an estimator.  (*Id.* 66-68.)  Accordingly, the Court finds no error with

respect to the ALJ's determination that plaintiff could perform the job of estimator as generally performed based on the DOT's description.

To the extent plaintiff argues that the hypotheticals should have included plaintiff's alleged need to lie down and miss work, this contention fails because the ALJ properly discounted plaintiff's credibility, as discussed above.  The ALJ's hypotheticals to the VE contained all the limitations that she found credible and supported by substantial evidence. *See Bayliss*, 427 F.3d at 1217-18 (ALJ may rely on VE testimony given in response to a hypothetical question that contains all of the limitations the ALJ found credible and supported by substantial evidence).  An ALJ is not required to include limitations that are not in her findings. *Rollins*, 261 F.3d at 857; *Osenbrock*, 240 F.3d at 1165.   Accordingly, the Court finds that the ALJ properly considered the impact of plaintiff's impairments at step four.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

For the reasons stated above, the Court finds that the Commissioner's decision is supported by substantial evidence and free from material legal error. Neither reversal of the ALJ's decision nor remand is warranted.

Accordingly, IT IS ORDERED that Judgment shall be entered affirming the decision of the Commissioner of the Social Security Administration.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: February 25, 2016

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

19